**In re David A. CRABTREE, Debtor.**

**D. Broward CRAIG, Trustee, Plaintiff,**

**v.**

**James CLIFFORD, Hugh Green, Classic Cars, Inc., David A. Crabtree, Tomaso Pasquariello, World Auto Body, Inc., and Patricia A. Shelby, Defendants.**

**Bankruptcy No. 3–83–01116.**
**Adv. No. 3–83–0940.**

United States Bankruptcy Court,
E.D. Tennessee.

Feb. 26, 1985.

Cadwalader, Wickersham & Taft, Mark C. Ellenberg, E. Charles Rowan, Jr., Washington, D.C., for plaintiff.

### CERTIFICATION TO THE UNITED STATES DISTRICT COURT OF QUESTION OF CRIMINAL CONTEMPT

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether this court should order the incarceration of the defendant for civil contempt of the court.

I

On July 14, 1983, involuntary chapter 7 proceedings were commenced against the debtor. On December 2, 1983, the trustee in bankruptcy commenced this adversary proceeding to compel the turnover of property of the estate from the defendant, James Clifford.

Clifford is a broker of imported automobiles operating in Hilton Head, South Carolina. Approximately one year before commencement of the debtor's bankruptcy case, Clifford sold the debtor a 1979 Ferrari. At about the time of the commencement of the debtor's bankruptcy case, the debtor commissioned Clifford to sell the car for him. Apparently, the paint on the automobile was defective. Clifford undertook to have the car repainted. The results were, however, not wholly satisfactory. Subsequently, Clifford negotiated with a buyer for a reduced price due to the paint problems. Clifford sold the car for $27,300.00.

By the middle of August 1983 Clifford had delivered the car to the buyer and had received payment in full. Since the debtor retained the certificate of title, however, Clifford did not convey the certificate of title. On August 17, 1983, Clifford sent

the debtor a cashier's check for $10,000.00. The trustee in bankruptcy has recovered that $10,000.00.

As noted, the trustee commenced this action seeking turnover of the Ferrari or its proceeds from Clifford and the buyer. The trustee subsequently entered into a court-approved settlement with the buyer.

On December 2, 1983, this court granted a temporary restraining order barring Clifford "from consuming or otherwise disposing of any proceeds" from the sale of the Ferrari.

On December 8, 1983, the trustee took a deposition of Clifford. Clifford testified that he had received the entire purchase price before forwarding the $10,000.00 payment to the debtor. He further testified that he was to have forwarded the balance upon receipt of the certificate of title. Regarding the status of the remaining proceeds of the sale, Clifford testified as follows:

Q. Is that money still in your bank account?

A. Yes, it's available. ... I have the funds I received....

Deposition of James Clifford (December 8, 1983) 39–40.

He also testified as follows:

Q. Do you happen to know the bank account number where the remaining proceeds are?

A. Yes, sir. *I have got the funds, which can be disbursed as soon as we receive title on the car.*

Q. Do you happen to know the account number?

A. No, sir, not right now.

Q. Is that something you could look up?

A. Not this second, but I mean *I can have the funds*—I don't know which account. I have got two different accounts.

Q. You are not sure which account they are in?

A. No, sir, not right now.

Q. Are both accounts with Southern Bank & Trust Company?

A. No. sir.

Q. What institutions are those accounts with?

A. I have an account with what is called First National now, formerly Bank of Beaufort.

Q. Is that the complete name?

A. Yeah. I have other funds sitting in Atlanta waiting on cars coming in from Europe, which is probably where that money is sitting. It's not an escrow account. It's with another company that I trust and don't have to worry about. *The funds are available.*

*Id.* at 44–45 (emphasis supplied).

On December 12, 1983, upon notice and a hearing, this court granted a preliminary injunction barring Clifford from "consuming or otherwise disposing of any proceeds" from the sale of the Ferrari. The office of the Clerk of this court mailed a copy of the preliminary injunction to Clifford.

On April 16, 1984, this court granted summary judgment to the trustee against Clifford in the amount of $17,300.00 plus interest from the date of commencement of this adversary action. Thereafter, despite the trustee's demand for payment, Clifford did not pay the judgment. Through subsequent collection efforts the trustee succeeded in collecting only $1,039.60.

On May 29, 1984, the trustee again convened a deposition of Clifford. Clifford testified as follows:

Q. Do you recall testifying in December in this matter that you had the funds, namely, $17,300, which were the proceeds of the sale of a Ferrari, which is the subject matter of this Adversary Proceeding?

A. I think I do remember.

Q. I'm reading from Page 39 from the deposition transcript from your December 8 deposition in this case. I asked you:

"As of August 17, 1983, the date you remitted $10,000 to Patty Shelby as Mr. Crabtree's agent, how much mon-

ey had you received from World Autobody?

Answer, I think at that date I was probably paid $27,300.

Question, You think you had received the full price?

Answer, I think we had.

Question, what had you done with that $27,300?

Answer, $10,000 was sent to Mr. Crabtree."

A few lines later I asked:

"Is that money still in your bank account?"

You replied, "Yes, it's available."

And then went on from there.

A. Okay. *It was available then at that time that we talked.*

Q. And, when you said it was available, you are referring to the $17,300 of the proceeds of the Ferrari, which you had not sent to Mr. Crabtree, or anyone acting on his behalf, right?

A. That is correct.

Q. What did you mean by available when you so testified?

A. At that time, I thought that, with the accounts and the money coming in from the cars that was happening at that time, the deals I was working on, that within a day or two I could issue that money out.

Q. And, did you, in fact, within a day or two, have access to $17,300?

A. No, sir.

Q. How much money did you really have on December 8, 1983, when you said you had the funds?

A. I'm not sure at that time.

Q. I'm reading from Page 39 and continuing on to Page 40 of your deposition transcript of December 8, 1983.

After you say, "yes, it's available," you go on to say:

"We were supposed to negotiate the final part of me and the paint, because I had to spend money on the car, and at one time, he didn't want to negotiate anything.

Question, he being whom?

Answer, Mr. Crabtree, and he knew I had the car pretty much sold and knew I had done the paint and he didn't want to negotiate with me and split the paint. It was coming out of my pocket. I was in a negative deal. I was going to lose money. After that, whatever his problem is occurred, because there were no more phone calls from him or anything. I wanted to negotiate my price down. I have the funds I received, and I have got the bill of sale."

And, it goes on from there. Do you recall testifying, "I have the funds I received"?

A. Yes sir.

Q. Did you, in fact, have the funds that you had received from the World Autobody?

A. *At that time I could have put the money together and paid, but I didn't.* That was when Crabtree stopped returning calls and would not discuss anything with me about the car.

Q. But, did you have the money, like you said you did?

A. *Like I said at that time, yes, I had it.*

Q. So, you were telling the truth on December 8 when you said you had the funds?

A. *I had access to the funds.* I mean, if I said it at that time, I knew some money was coming in, or whatever, from one of my deals, because we have a lot of money moving around in these cars.

Q. When you said you had the funds, did you mean that you had access to funds then available which were at your disposal to use for whatever purpose you wanted?

A. *To my knowledge, when I said it that day, I felt I could come up with the $17,000 to settle this matter with Crabtree.*

Q. And, do you have the $17,300 now?

A. No. sir.

Q. What's happened to that fund or those funds which you thought were available at the time of December 8, 1983?

A. During that time and now I've had some serious losses, and some money spent on cars, and just things happening in normal business that the funds were out, and I'm waiting on to get my money back so I can settle this matter. I intend to take care of this matter. With the economy and just some bad luck, I'm just short.

Deposition of James Clifford (May 29, 1984) 24–28 (emphasis supplied).

The trustee in bankruptcy has filed a motion requesting this court to hold Clifford in civil contempt and to order Clifford jailed until he purges his contempt. The trustee has not requested the imposition of a fine because of the trustee's belief that such would merely be a futile gesture in light of Clifford's demonstrated financial elusiveness.

The trustee has introduced certain testimony respecting defendant's earnings and evidence indicating that defendant continues to engage in business travel and transactions.

## II

As this court is persuaded that the remedy sought by the trustee is in the nature of punishment for criminal contempt, this court hereby certifies these facts to the United States District Court for the Eastern District of Tennessee for appropriate action.

With respect to the difference between civil and criminal contempt, the United States Supreme Court has said:

It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.

If imprisoned ... [citation omitted] "he carries the keys of his prison in his own pocket." He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.

On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. Imprisonment cannot undo or remedy what has been done, nor afford any compensation for the pecuniary injury caused by the disobedience. If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience.

*Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 441–43, 31 S.Ct. 492, 498–99, 55 L.Ed. 797 (1911).

Furthermore:

Civil contempt is characterized by the court's desire to compel obedience to a court order, [citation omitted] or to compensate the contemnor's adversary for the injuries which result from the noncompliance. [citation omitted] Thus, there are two forms of civil contempt: compensatory and coercive. [citation omitted] A contempt adjudication is plainly civil in nature when the sanction

imposed is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent to offenses against the public. [citation omitted] A court's power to impose coercive civil contempt depends upon the ability of the contemnor to comply with the court's coercive order. [citations omitted].

*Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir.1983).

In *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948), the United States Supreme Court considered the civil contempt remedy of coercive imprisonment in the context of a bankruptcy turnover order. The court stated:

[T]he turnover order may not be attacked in the contempt proceedings because it is res judicata on this issue of possession at the time as of which it speaks. But application of that rule in these civil contempt cases means only that the bankrupt, confronted by the order establishing prior possession, at a time when continuance thereof is the reasonable inference, is thereby confronted by a prima facie case which he can successfully meet only with a showing of present inability to comply. He cannot challenge the previous adjudication of possession, but that does not prevent him from establishing lack of present possession. Of course, if he offers no evidence as to his inability to comply with the turnover order, or stands mute, he does not meet the issue. Nor does he do so by evidence or by his own denials which the court finds incredible in context.

But the bankrupt may be permitted to deny his present possession and to give any evidence of present conditions or intervening events which corroborate him. The credibility of his denial is to be weighed in the light of his present circumstances.... The fact that he has been under the shadow of prison gates may be enough, coupled with his denial and the type of evidence mentioned above, to convince the court that his is not a wilful disobedience which will yield to coercion.

*Maggio v. Zeitz*, 333 U.S. at 75–76, 68 S.Ct. at 411–12.

The court also observed:

[W]hile a bankrupt's denial of present possession, standing alone may not be sufficient to establish his inability to produce the property or its proceeds, if the Court is satisfied, from all the evidence properly before it, that the bankrupt has not the present ability to comply, the commitment order should not issue.

*Maggio v. Zeitz*, 333 U.S. at 73 n. 6, 68 S.Ct. at 410 n. 6.

In the instant case, Clifford's contempt of this court arose from either or both (1) his failure to abide by this court's preliminary injunction barring him from consuming or disposing of the proceeds of sale of the automobile (2) his failure to turn over the $17,300.00 in proceeds.[1] Clifford has offered no defense to this motion to hold in contempt. However, his testimony was before this court in the form of depositions filed by the trustee. This court is satisfied from all of the evidence before it that Clifford consumed or disposed of the proceeds of the sale and has a present inability to either comply with the injunction or to turn over those proceeds to the trustee.

Clearly, once Clifford violated the injunction and consumed the proceeds, he could not undo his actions. He cannot now abide by that injunction. He cannot now turn over those wasted proceeds. An hour, a day, or even a year of imprisonment cannot coerce him to obey the court's directive.

1. Although the complaint in this adversary proceeding sought "the turn-over by defendants of the Ferrari and any proceeds therefrom," the proposed judgment prepared and submitted by the trustee, and subsequently entered by this court, did not specifically order the turnover of property. Rather, it was couched in the form of a monetary judgment for $17,300.00, plus interest. Even treating the judgment as an order to turn over property, the issue for purposes of this contempt determination is not, as the trustee appears to believe, whether Clifford's current earnings enable him to pay a $17,300.00 monetary judgment. The issue is whether Clifford retained and refuses to turn over the proceeds of the sale of the car which he testified were in his possession shortly after commencement of this action in December 1983.

Thus, any commitment now must be purely punitive, and not remedial, in nature.

As the Court observed in *Maggio v. Zeitz*:

> Conduct which has put property beyond the limited reach of the turnover proceeding may be a crime, or, if it violates an order of the referee, a criminal contempt, but no such acts, however reprehensible, warrant issuance of an order which creates a duty impossible of performance, so that punishment can follow.

*Maggio v. Zeitz*, 333 U.S. at 64, 68 S.Ct. at 405.

Under the former Bankruptcy Act and Bankruptcy Rule 920, a bankruptcy referee had limited remedial and punitive contempt powers. Subsequently, however, under the Bankruptcy Code and 28 U.S.C.A. § 1481 (repealed 1984)[2] the contempt powers of the Bankruptcy Judge were less limited than those previously exercised by the referee. *See generally* 1 *Collier on Bankruptcy* ¶ 3.01[5][b][v] (15th ed. 1984). However, § 1481 explicitly prohibited a Bankruptcy Judge from punishing a criminal contempt by imprisonment.

This court notes that Congress failed to reenact § 1481 under the various changes in bankruptcy law made pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984. *See* 28 U.S.C.A. § 1481 (Supp. 2 Sept.1984).

Bankruptcy Rule 9020(a)(3) provides:

> *Certification to District Court.* If it appears to a bankruptcy judge that criminal contempt has occurred but the court is without power under 28 U.S.C. § 1481, to punish or to impose the appropriate punishment for the criminal contempt the judge may certify the facts to the district court.

In view of the current lack of statutory clarity respecting the criminal contempt powers of the Bankruptcy Judge, this court therefore certifies the above facts to the United States District Court for the Eastern District of Tennessee for appropriate action.

---

**2.** This section provided:

> A bankruptcy court shall have the powers of a court of equity, law, and admiralty, but may not enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment.
>
> 28 U.S.C.A. § 1481 (repealed 1984).