**In re SASSON JEANS, INC., d/b/a Sasson Industries and Sasson, Debtor.**

**Bankruptcy No. 86 B 12438 (BRL).**

United States Bankruptcy Court,
S.D. New York.

Dec. 2, 1987.

---

**290**

Javits, Robinson, Brog, Leinwand & Reich, P.C., New York City; by Robert Leinwand, of counsel, for Sasson Jeans, Inc.

Cole & Deitz, New York City; by Edward N. Meyer and Angela Somers, of counsel, for Sasson Jeans, Inc., Trustee.

Scherling, Davidson & Rech, P.C., New York City; by Bruce D. Scherling and Gustav Rech, of counsel, for Jag Beverly Hills, Inc., Trustee.

Gerald J. McMahon, New York City, for Paul Guez and Exactitude, Inc.

Kaye, Scholer, Fierman, Hays & Handler, New York City; by Michael Guss, of counsel, for creditors committee.

Rudolph Giuliani, U.S. Atty. Gen., New York City; by James Garrity, of counsel.

## CERTIFICATION OF CONTEMPT

### BURTON R. LIFLAND, Chief Judge.

I, Burton R. Lifland, Bankruptcy Judge in the above-entitled case, upon the Application of Bert K. Bergenfield, the duly appointed and qualified Chapter 11 Trustee (the "Trustee") of Sasson Jeans, Inc. ("Sasson" or the "Debtor"), and after a hearing held on November 19, 1987, on due notice to Paul Guez, do hereby respectfully submit the following Proposed Findings of Fact and Conclusions of Law to the United States District Court for the Southern District of New York.

The Trustee moved by order to show cause, signed on November 3, 1987 and returnable on November 19, 1987, for an order finding Paul Guez:

(1) to be in civil contempt of this Court for disobedience of its orders dated: (a) September 14, 1987 and (b) October 7, 1987, which orders required Paul Guez to appear for an examination under Fed.R.Bankr. P. 2004. The Trustee requested that Mr. Guez be imprisoned until he complies with those orders, and that he be fined and directed to pay the Trustee's attorneys' fees.

(2) to be in criminal contempt for orchestrating the removal, concealment and secretion from a warehouse in California of a substantial and significant portion of the Debtor's assets, in September of 1987, and that he be imprisoned on account thereof.

On November 19, 1987 I conducted a hearing on the Trustee's order to show cause for the imposition of civil and criminal sanctions. At the hearing I indicated that I would treat separately the issue of a certificate of civil contempt with respect to Mr. Guez' failure to appear for an examination under Bankruptcy Rule 2004, which contempt could be purged if Mr. Guez appeared for examination. On November 20th, I was advised by counsel for the Trustee and counsel for Mr. Guez that Mr. Guez had appeared and that his examination had commenced. Under these circumstances, I will withhold any recommendation on that civil contempt request, pending completion of the examination under Bankruptcy Rule 2004. Below are this Court's findings and conclusions on that part of the Trustee's motion seeking a certification of criminal contempt.

## PROPOSED FINDINGS OF FACT

1. Paul Guez was, until his removal by the Trustee, the President of Sasson, its Chief Executive Officer and Chief Financial Officer. He is Sasson's sole stockholder.

2. On October 10, 1986, Sasson filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central

District of California. By order dated November 12, 1986, the venue of the Sasson Chapter 11 case was transferred to the Southern District of New York.

3. By order to show cause signed February 27, 1987, and again by order to show cause signed May 6, 1987, the Official Committee of Unsecured Creditors in the Sasson Chapter 11 case moved for an order directing the United States Trustee to appoint a Chapter 11 trustee to administer the Sasson Chapter 11 case, manage Sasson's business and marshall its assets.

4. Upon the May 6 order to show cause of the Official Committee of Unsecured Creditors for the appointment of a trustee, and the Debtor's subsequent oral application at the May 22, 1987 hearing for the appointment of an examiner in lieu of a trustee, this Court signed an Order on June 1, 1987, appointing Robert J. Rosenberg as Examiner of Sasson. That order was signed with the consent of Debtor's counsel and Paul Guez. (May 22, 1987 Transcript ("Tr.") at 220—THE COURT: "this is on consent; is that correct, Mr. Baime? MR. BAIME: Yes. THE COURT: Is that correct Mr. Guez? MR. GUEZ: Yes, Your Honor.")

5. That order, which was prepared and presented by Debtor's counsel, provided that a Chapter 11 trustee would be appointed in the event Sasson did not comply with its provisions. At the May 22nd hearing Paul Guez explicitly consented to this provision and to cooperate with the examiner. (May 22, 1987 Tr. at 220—"THE COURT: With respect to the operations of the business, I expect that the duly retained representatives of the creditors, and that includes their accountants, and the examiner, the appointed examiner, will get your complete cooperation. MR. GUEZ: Absolutely, Your Honor.")

6. Based upon Debtor's subsequent failure to comply with the provisions of the June 1st order, conceded by Debtor's counsel (see this Court's memo endorsement on Debtor's July 14, 1987 order to show cause for a hearing to determine whether Debtor complied with the terms of the June 1, 1987 order), this Court directed the appointment of a Chapter 11 trustee. Mr. Bergenfield has qualified and is presently acting as Chapter 11 Trustee for Sasson.

7. Pursuant to the statutory standards enunciated in 11 U.S.C. § 704 as incorporated by 11 U.S.C. § 1106, as well as this Court's July 30, 1987 order, the Trustee has replaced Paul Guez in managing and operating Sasson, and has been vested with complete control over its operations and management functions since his appointment.

A. *The Prior Orders and Directions of this Court.*

8. On July 30, 1987, the Court issued an order which, in part, specifically states that it is:

ORDERED that all persons having possession, custody or control of any property of Sasson Jeans, Inc., d/b/a Sasson Industries and Sasson other than a custodian (as that word is defined in Section 101(10) of the Bankruptcy Code) be and each such person hereby is, specifically directed to turn over all such assets, including, without limitation, all books and records relating to Sasson Jeans, Inc. to Bert K. Bergenfield as Chapter 11 Trustee of Sasson Jeans, Inc. or his written designee.

(Exhibit 1.)[1]

9. On the record of a hearing held on August 5, this Court admonished Mr. Guez:

Under the circumstances, this record makes it abundantly clear that you do regard this enterprise as your own per-

---

**1.** All exhibits referred to herein were introduced into evidence at the hearing on November 19, 1987, and unless otherwise indicated, "Tr." refers to pages of the transcript of the November 19th hearing.

sonal enterprise and apparently as a practical matter, you do not recognize the full role of the Trustee in the operation of the Debtor's business.

The testimony has not been rebutted with any credible force that your activities have interfered in the operations and with the Trustee in the performance of his statutory duties concerning this Debtor and under Title 11.

You have been displaced in the management functions. You do not seem to have recognized that[.] [E]ven with respect to the period of time that an [E]xaminer was involved with the operations of the business, under limited circumstances[.] [D]ealing with the Debtor's assets as if they are your own, under all the circumstances here is clearly inappropriate and indeed illegal.

The right of the Trustee to operate this business without interference is clear.

(Exhibit 3, at Tr. 162–163).

10. Also, on August 5, 1987, the Court signed an order which, in part, reads that it is:

ORDERED that Paul Guez is specifically directed to turn over all property of Sasson to the Trustee or his written designee.

(Exhibit 2).

11. I find that Paul Guez was served with the July 30th order and that the August 5th order was signed in Court, in Mr. Guez' presence, subsequent to a hearing at which he was present. (*See*, August 5, 1987 Tr. at 118–19, examination of Stephen P. Byrne by Trustee's counsel—"Q. Now you say the Marshalls identified themselves to Mr. Guez and served him with some papers? A. Yes. . . . Q. Is this document entitled, 'Order Directing Compliance with July 30th Order' [the document] to which you referred? A. Yes, it is." That order directing compliance made reference to, and had affixed to it, a copy of the July 30th order. *See also*, August 5,

1987 Tr. at 166, 169—"THE COURT: Mr. Guez, I have signed this injunction order which is directed to you personally and you will abide by the terms of the Order. MR. GUEZ: I will."). Accordingly I find that Mr. Guez was aware of the terms of both of these orders.

12. At a hearing on October 7, 1987, the Court was apprised of the Trustee's claim that a substantial portion, both quantitatively and qualitatively, of the Debtor's inventory and other property had been removed by Mr. Guez from a warehouse in Vernon, California.[2] As I shall discuss below, Mr. Guez did not disclose the whereabouts of that inventory. Instead, he was evasive and was totally uncooperative with respect to what amounts to some of the most significant assets of the estate.

13. By order to show cause signed November 3, 1987, the Trustee moved to punish Mr. Guez for criminal contempt for orchestrating the removal and concealment of the inventory from the Vernon, California warehouse. A hearing was held on that motion on November 19, 1987.

### B. *The Testimony at the November 19 Hearing.*

14. The Trustee called Mary Sianis, an employee of Union Pacific Railroad ("Union Pacific"). She testified that at the end of August, 1987, she was asked by Gustave Guyon to give an estimate of the cost of moving some material from California to New York. (Tr. at 26, 27). She testified that she was told that Mr. Guyon was working for Paul Guez and was making the inquiry on behalf of Sasson. (Tr. at 27, 47–48). Ms. Sianis testified that, subsequently, an order was placed for goods to be picked up at 2610 East 37th Street, Vernon, California and shipped to "Jag Beverly Hills" at 1 Whitney Lane, Old

---

2. The Trustee testified that the removed inventory totaled approximately 400,000 units, (i.e. 540,000 units minus 131,000 units). (October 7, 1987 Tr. at 71). Applying the Trustee's testimo-

ny regarding valuation of this inventory, it is estimated to be worth, at a minimum, over $2.8 million dollars (applying a $7.00/unit cost to the inventory). *Id.* at 67–71.

Westbury, Long Island. (Tr. at 27–28).[3] At the hearing of October 27, 1987, Mr. Guez stated that he resided at 1 Whitney Lane, Old Westbury, Long Island. (October 27, 1987 Tr. at 63). Ms. Sianis was directed to send the freight charges to Paul Guez, Jag Beverly Hills, 17 East 66th Street, New York, New York. (Tr. at 31.) 17 East 66th Street, New York, New York is the address of the Townhouse owned by the Debtor which was occupied by Mr. Guez until the early part of October, 1987.

15. Ms. Sianis testified that Union Pacific shipped twenty-six trailers from Vernon, California to New York. (Tr. at 31–32). Union Pacific attempted to deliver the trailers to the 1 Whitney Lane address, but could not do so because it was in a residential neighborhood. (Tr. at 34–36). Ms. Sianis had two conversations with Mr. Guez regarding where the trailers were to be delivered. (Tr. at 35). Mr. Guez told Ms. Sianis that he would look for a warehouse and said that if he was unavailable, Ms. Sianis should speak with Marco Amar. (Tr. at 36–37). Eventually, Mr. Amar told Ms. Sianis to have the trailers delivered to a warehouse at North Fourth Street and Bedford Avenue in Brooklyn, New York. (Tr. at 36–37).

16. Ms. Sianis testified that twenty-two trailers were, in fact, delivered to that address. (Tr. at 38–39). She said that there was some difficulty delivering the goods, because parked cars were obstructing the entrance to the loading dock of the warehouse, and that she had approximately three conversations with Mr. Guez regarding these problems. (Tr. at 38.)

17. Ms. Sianis further testified that after the trailers were delivered, she discussed with Mr. Guez the fact that charges for delivery were due to Railway Express.

(Tr. at 39–40). She said that on September 24th, she received $2,300 in cash which was delivered by an employee of Paul Guez. (Tr. at 40; Exhibit 4). Later, Mr. Guez sent $1,000 in cash and a check for $3,000 to Ms. Sianis' office to partially pay the demurrage charge for Railway Express. (Tr. at 43–44). At the request of Mr. Guez' employee, Ms. Sianis had a typed receipt prepared to reflect such payment. (Tr. at 44; Exhibit 5).

18. Finally, Ms. Sianis testified that she prepared a letter to Mr. Guez concerning the monies due to Railway Express, and that she personally delivered that letter to Mr. Guez (Tr. at 45, Exhibit 6). Ms. Sianis identified Mr. Guez at the hearing. (Tr. at 45). I found Ms. Sianis' testimony to be entirely credible. Although Mr. Guez was present in Court and was represented by counsel, as was Sasson, Ms. Sianis' testimony was unrebutted.

19. Mr. Bergenfield, the Debtor's Trustee, also testified at the Hearing. He said that he had visited the warehouse at the corner of North Fourth Street and Bedford Avenue in Brooklyn on November 18th, and that he saw a significant amount of inventory, office equipment, office furniture and records. (Tr. at 51). Most of the inventory was in boxes, and a few of the boxes were broken. (Tr. at 51). The boxes were identified by a mark on the side as either "SJI", "Sasson" or "Jag".[4] (Tr. at 52). The hang tags on the clothes in the broken boxes were hang tags reading either "Sasson" or "Jag." (Tr. at 52). Mr. Bergenfield also testified that he saw some computer equipment at the warehouse and some records. Mr. Bergenfield observed that these records, which consisted of computer runs, were labeled either "Sasson Jeans, Inc." or "Jag." (Tr. at 53).

20. Further, Mr. Bergenfield testified that on September 2, 1987, he had visited the warehouse at 2610 East 37th Street in Vernon, California. (Tr. at 53). Mr. Ber-

3. Paul Guez contends that he is the sole shareholder of Jag Beverly Hills, Inc. which is a Debtor under Chapter 7 of the Bankruptcy Code. Bruce Scherling has been appointed interim trustee in that case.

4. SJI is the abbreviation for Sasson Jeans, Inc.

genfield, at that time, saw inventory, goods and office equipment. (Tr. at 53–54). Mr. Bergenfield testified that the inventory and equipment which he saw in the Brooklyn warehouse appeared to be the same inventory and equipment he had seen in the Vernon warehouse. (Tr. at 54).

21. Mr. Bergenfield testified that on September 30, 1987, he discussed the missing inventory with Mr. Guez. Mr. Bergenfield's testimony in this respect is as follows:

A: Mr. Guez initiated the conversation by asking me or requesting that I do not harass, I am using his words now, harass Cheryl Adair.

Q: What did you say and what did he say as best you can remember.

A: As best I can remember and I am paraphrasing now, but as best I can remember, I asked Mr. Guez where is the California inventory? Mr. Guez responded "I—leave Cheryl Adair alone, *it was taken under my direction, I took the inventory.*" [Emphasis added]. I then asked Mr. Guez where is the inventory. He said it doesn't exist, it has been sold.

I then asked Mr. Guez where are the proceeds of the sale of that inventory and he refused to answer.

(Tr. at 55). I found Mr. Bergenfield's testimony to be entirely credible. Although Mr. Guez was present in Court and was represented by counsel, as was Sasson, Mr. Bergenfield's testimony was unrebutted.

22. Mr. Guez presented no evidence at the Hearing. (Tr. at 66). At the request of his counsel, I agreed that the objection which Mr. Guez submitted at the October 27th hearing should be considered in connection with this charge of criminal contempt, together with the transcript of Mr. Guez' testimony at the October 27th hearing (Exhibit 7), which had already been introduced into evidence without objection. (Tr. at 64, 76–77).

23. Although Mr. Guez, when questioned under oath at the October 27, 1987 hearing, was responsive to certain questions regarding the whereabouts and disposition of the property at issue, he selectively and randomly invoked the Fifth Amendment in response to other questions regarding that property. At that hearing, Mr. Guez testified, in part, as follows:

Q. Mr. Guez, is it true that approximately thirteen railroad containers of inventory were removed from the Vernon warehouse on September 5th and 6th?

A. Is it true? I don't know I—

Q. Was inventory removed in that period?

A. There is a lot of inventory that was shipped, yes.

Q. Do you know where that inventory was shipped?

A. I did answer that question to you already asked many times.

Q. Would you please tell us where this inventory was shipped, sir?

A. If you allow me to go to California I will show you where the records are.

\* \* \* \* \* \*

Q. You were concerned that those goods would be sold at fair market value, were you not?

A. They were.

Q. They were—

THE COURT: To whom?

THE WITNESS: To clients

THE COURT: What clients?

THE WITNESS: Sym's

THE COURT: Sym's

THE WITNESS: Dress Barns. I don't take orders.

THE COURT: Who else?

THE WITNESS: I don't know.

\* \* \* \* \* \*

Q. Are any of the goods removed from the Vernon warehouse on September 5 and September 6th stored in any location in the United States at this moment?

A. I don't know.

THE WITNESS: Can I have some water?

Q. What was the answer, sir?

A. I would like to take the Fifth.

Q. You are invoking the Fifth Amendment?

A. Yes.

Q. Mr. Guez, I ask you, sir, whether any of those goods taken from the warehouse on September 5th and 6th are in any warehouse which you control or lease, sir?

A. Fifth.

Q. I ask you, sir, whether there are any proceeds in any account under your control or held for your benefit in the United States, sir?

A. Excuse me?

Q. I will rephrase the question. Is there any account which you control or which is held for your benefit in the United States or in any foreign jurisdiction which holds proceeds from the sale of the goods taken from the Vernon warehouse on September 5th and 6th?

A. There isn't.

Q. Is there any—are any of the goods removed from the Vernon warehouse on September 5th or 6th stored in the State of California, sir?

A. Fifth Amendment.

Q. Are any goods taken from the Vernon warehouse on September 5th and 6th stored in the State of New Jersey?

A. Fifth.

THE COURT: Have you discussed with your counsel the impact of taking the Fifth Amendment, Mr. Guez?

THE WITNESS: My counsel informed me to take the Fifth.

(Exhibit 7, Tr. at 68–78).

24. At the conclusion of Mr. Guez' testimony on October 27th, I observed:

The testimony of Mr. Guez in support of his objection, I find incredible. I find it to a high degree to be disingenuous.

To the extent he has deigned to answer appropriate questions as to the inventory, pricing, disposition, which is all part and parcel of the objection that was filed, he has shown from the stand a distinct lack of willingness to substantiate the statements made by his counsel and in the objection as to value and as to ownership.

(Exhibit 7, at 95–96). I would reach the same conclusion today.

25. I find therefore that substantial assets of the Debtor,[5] (including computer records), all contained in more than twenty trailer loads, were moved from Vernon, California and secreted in a warehouse in Brooklyn, New York. I further find that Paul Guez was intimately involved in, and willfully arranged for: (a) the removal of the assets from California; (b) its shipment to New York; and (c) its concealment from the Trustee—first at his home and, later, at the Brooklyn warehouse, in willful and deliberate contravention of the July 30th and August 5th orders.

26. I further find that Mr. Guez willfully and deliberately intended to mislead and did mislead the Trustee and the Court concerning his participation in these events and that, except for the diligence of Messrs. Bergenfield and Scherling, he might have been completely successful in his efforts to defraud these trustees and divert estate property for his own use and benefit.

## PROPOSED CONCLUSIONS OF LAW

1. The instant order to show cause moves for this Court to certify to the District Court proposed findings of fact and conclusions of law, relating to the criminal contempt of Paul Guez. The procedure of certifying criminal contempt matters from the Bankruptcy Court to the District Court is in accord with accepted procedure. *Hubbard v. Fleet Mortg. Co.*, 810 F.2d 778, 780 (8th Cir.1987); *In re Industrial Tool Distributors, Inc.*, 55 B.R. 746 (N.D.Ga.1985); *In re Crabtree*, 47 B.R. 150 (Bankr.E.D. Tenn.1985). *See also, Martin–Trigona v. Shiff*, 702 F.2d 380, 383 (2d Cir.1983) ("the bankruptcy court was not empowered to order a recalcitrant witness to be imprisoned for civil contempt.").[6]

*Sequoia Auto Brokers Ltd., Inc.*, 827 F.2d 1281, 1291 n. 19 (9th Cir.1987)

---

5. *See* footnote 2.

6. This procedure is not inconsistent with the operation of Fed.R.Bankr.P. 9020. *See In re*

2. There is a distinction between the purpose to be served by a civil contempt order and a criminal contempt order. "[A] civil contempt order is remedial and coercive in nature, and is intended to secure compliance with lawful judicial decrees." *In re Irving,* 600 F.2d 1027, 1037 (2d 1979) *cert. denied,* 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). A criminal contempt order on the other hand is intended "to punish willful disregard of the authority of the courts and to deter the occurrence of similar derelictions." *Id.* (citing *U.S. v. United Mine Workers,* 330 U.S. 258, 302–03, 67 S.Ct. 677, 700–01, 91 L.Ed. 884 (1947)). "Sentences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court." *U.S. v. Mine Workers,* 330 U.S. at 302, 67 S.Ct. at 700–01 (citing *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911).

■ 3. A defendant will be held in criminal contempt for not complying with an appropriate, clear order, where that noncompliance is found, beyond a reasonable doubt, to have been willful. *Falstaff Brewing Corp. v. Miller Brewing Co.,* 702 F.2d 770, 782 (9th Cir.1983); *Powell v. Ward,* 643 F.2d 924, 933 n. 12 (2d Cir.1981), *cert. denied* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). Willfulness in contempt cases is defined as "a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order." *Falstaff Brewing Corp. v. Miller Brewing Corp.,* 702 F.2d 770, 782 (9th Cir.1983).

4. Having considered the evidence presented at the Hearing on November 19th, I concluded at that time as follows:

THE COURT: An early definition of contempt both criminal and civil can be found in [G]ompers against Bucks Stove & Range, 221 U.S. 418 ... a 1911 case which set forth that "Criminal contempt relates to a completed act or acts of disobedience, the sentence arising out of that is punitive and to vindicate the authority of the Court."

. . .

The civil contempt, on the other hand, as defined in that case, "is a refusal to do an act ordered. The sentence is usually considered remedial and the contemnor has an opportunity to purge or redeem himself or herself from that contempt".  . . .

Certainly on the record before me the Trustee has amply justified and this Court is prepared to certify that its authority has been flouted, there has been disobedience and contumacious conduct by Respondent here sufficient to warrant a certification of both criminal and civil contempt.

There has been flouting of both written and oral orders and directions of this Court.

There is nothing in the record that's been brought before me, Mr McMahon that shows that Mr. Guez is unaware of the orders and directions of this Court relating to the property and properties and information in question.

Absolutely nothing to show his ignorance of these matters.

Mr. McMahon ... there is a complete attitude that's been exhibited on the part of your client,, to some extent, "catch me if you can"...

There is nothing in this record that demonstrates that he is unaware of that, or that there is any excuse for his conduct. (Tr. at 78–83).

■ 5. Criminal contempt is an appropriate remedy under the circumstances of the case at bar. Mr. Guez cannot be allowed to conduct himself, in the flagrant manner established by this record, with impunity. He has willfully ignored and flouted lawful orders and deliberately interfered with this Court's administration of the case. Although Mr. Guez volunteered his own company, Sasson, as a debtor in the federal court, he nevertheless disdains that court's process. Monetary or other sanctions are not likely to be a deterrent to Mr. Guez's obstructionist tactics. See, *In re: Men's Sportswear, Inc., Men's Sportswear, Inc. v. Sasson Jeans, Inc.,* 834 F.2d

1134, 1139 (2d Cir.1987) (Willful misconduct by Sasson). The Trustee has proven beyond a reasonable doubt, by unrebutted evidence, that Mr. Guez' behavior with regard to the transferring and concealing of the Debtor's inventory, merits the imposition of criminal sanctions. The record establishes beyond a reasonable doubt that Mr. Guez was aware of his obligation to turn over the assets of the Debtor. It is beyond a reasonable doubt that he knowingly and willfully violated the July 30, 1987 and August 5, 1987 written orders, (orders which Mr. Guez was either served with or were signed in Court, in his presence, subsequent to a hearing at which he was present), (paragraph 11 *supra*), and the August 5, 1987 oral direction of this Court to him, which he explicitly consented to abide. *Id.* Mr. Guez did so by attempting to secrete a substantial portion of the Debtor's assets by moving them from California to the warehouse in Brooklyn. The record establishes beyond a reasonable doubt that the subject property was property of the Debtor's estate.[7] Mr. Guez submitted no convincing evidence which establishes that these assets belonged to any entity other than the Debtor's estate.

6. 18 U.S.C. § 401 vests District Courts with "discretion" in determining a term of imprisonment to punish for criminal contempt, resulting from disobedience of a lawful order. The principle of "proportionality" provides guidance in exercising that discretion and determining the term of imprisonment. *U.S. v. Garcia*, 755 F.2d 984, 989 (2d Cir.1985). In the instant matter the assets of the Debtor were purloined on or about September 5, 1987 and were not found until about November 15, 1987—a period of just over two months. Under the circumstances, applying concepts of "proportionality", I propose that Mr. Guez be imprisoned for not less than the same period of time that the California assets remained under his covert dominion and control *i.e.*, for two months.

7. Other assets attributable to the "Jag" bankruptcy estate were similarly secreted by Mr.

7. I certify these proposed Findings of Fact and Conclusions of Law to the District Court.

Guez, see November 19, 1987 Tr. at 51–52.