In re Edgar TIMMONS, Jr., Hercules Anderson, Christopher McIntosh, Jr. and Theodore Franklin Clark, Appellants.

No. 79–2124
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Nov. 19, 1979.

* Fed.R.App.P. 34(a); 5th Cir.R. 18.

Clarence L. Martin, Savannah, Ga., Nathaniel R. Jones, Margaret Ford, New York City, for Timmons et al.

Orin L. Alexis, Savannah, Ga., for Clark & McIntosh.

Wm. T. Moore, Jr., U. S. Atty., Milissa S. Mundell, Asst. U. S. Atty., Savannah, Ga., for plaintiff-appellee.

Before GOLDBERG, RUBIN and POLITZ, Circuit Judges.

PER CURIAM:

In a pastoral panegyric coupled with citation of legal authority, appellants, who were sentenced to thirty days imprisonment for criminal contempt of a district court order commanding them to vacate a federal wildlife refuge situated on an idyllic estuary on the coast of Georgia, challenge the validity of the order they were accused of violating and the regularity of the proceedings condemning them. Precedent, logic and respect for public order, however, require us to affirm the contempt judgment, for reasons we set forth below.

### I.

"I was fain to think I had landed on some one of these fairy islands said to have existed in The Golden Age." James Audubon, 1831 [1]

The chain of barrier islands and estuaries that forms the coast of Georgia, known as Guale, caught Audubon's fancy as they have captivated almost all nature lovers before and since. Indeed, almost two centuries earlier, James Hilton wrote,[2] "The country abounds . . . as the Indians say, in winter with swans, geese, cranes,

---

1. Quoted from the appellants' brief, which in turn quotes from the report in R. Hanie, Guale (1974) (published by The Seabury Press, New York).

2. As quoted in appellants' brief from R. Hanie, *supra* n. 1.

ducks, and innumerable other water fowls, whose names we know not, which lie in the rivers, marshes, and on the sands . . ."

To the northeast of the northern end of one of the isles of Guale, known as Blackbeard Island, sheltered from the sea by the southern end of St. Catherine's Island, lies a boar's-head shaped estuarian hammock of 2,700 acres which has, since man has known it, served as home for both native and migratory waterfowl. It is called Harris Neck, after a small community at the lower jowl of the head.

The tribes of the Creek confederacy, which once inhabited these islands, were conquered by Spaniards. The territory was then claimed by the British. By the time of the Civil War, the islands had become cotton and indigo plantations, cultivated by slaves. When General Sherman occupied Georgia he ordered the islands left to the exclusive management of the freed black people. Thereafter much of the islands area came again into white hands. However, 300 acres on Harris Neck was acquired by William Timmons, described in the brief of his grandson, Edgar Timmons, Jr., "as the most enterprising of these slaves and sons of slaves."

In 1942, the federal government acquired the Timmons land by condemnation for a price alleged to be $8.72 an acre, intending to use it as an airfield. The appellants contend that, to induce the residents to leave without making trouble, War Department representatives told the residents that, as soon as the government no longer needed the land, they could return, repurchasing the lands at the price they had received from the government. They also contend that the price paid Timmons was grossly unfair, because another landowner was paid over $172 an acre.

The legal proceedings were not ended until 1948. Thereafter, the land was conveyed to McIntosh County, Georgia, which eventually reconveyed it to the United States. In 1962, the Harris Neck National Wildlife Refuge was established by the United States Fish and Wildlife Service. It contains 2687 acres and includes the Timmons tract.

As much a sanctuary now, apparently, as it was in Hilton's day or Audubon's, the wildlife refuge serves as a bird refuge providing habitat for migratory ducks and geese, wading birds, and resident species. The area is managed by the Wildlife Service. Its water and resources are manipulated to provide food and shelter for the wildlife. For the protection of the environment, camping is not permitted at the refuge and access to it is restricted during the nesting season, from March to June.

On Friday, April 27, 1979, appellants Edgar Timmons, Jr., Hercules Anderson, Chris McIntosh, Ted Clark, and others entered the wildlife refuge with the apparent intention of asserting Timmons' claim to the land. That afternoon, they constructed camp sites without permits or authorization and informed the Project Leader of the Savannah National Wildlife Refuge Complex, Department of Interior, that they intended to remain indefinitely. When informed that camping in a national wildlife refuge violated federal regulations, Clark and McIntosh said that they did not recognize the area as federal property but felt that it belonged to the previous owners.

The appellants say of Mr. Timmons:

Having failed in all his address to the government, he went upon the land to pray that God deliver him, that He help him gain the attention of his government, that He bring him home. In this attitude of prayer, with his minister and two others, Edgar Timmons, Jr., was arrested by the same government that had sent soldiers to liberate the land on St. Catherine's from the freedmen one hundred and twelve years ago.

However, the record indicates that Mr. Timmons and his minister did not rely only on divine aid. By April 30, 1979, there were approximately twenty-five to forty individuals on the reservation with approximately six tents. The occupants had brought into the area several unauthorized off-road vehi-

cles, such as go-carts and small motorcycles, and something like forty automobiles. They built numerous fires, which were of course, unauthorized. Then they commenced bringing building materials, including concrete blocks, bags of mortar and ladders.

The United States government then filed a complaint for ejectment, a civil action, against Edgar Timmons, Jr., a group known as People Organized for Equal Rights and other unknown individuals in federal court. The court signed an ex parte temporary restraining order in connection with this complaint for ejectment requiring the defendants immediately to cease bringing building materials onto the wildlife refuge and forbidding them to construct any structures of a permanent nature. It further ordered them to remove themselves and all of their personal belongings by 5:00 p. m. on May 1, 1979.

The occupants having failed to vacate the refuge, on the next day the U.S. Attorney, an Assistant U.S. Attorney and the U.S. Marshal came to the area to meet with appellants and discuss the order that had been entered. They encouraged the appellants to leave the area voluntarily and pursue their claims through normal judicial proceedings. The U.S. Attorney spoke personally with appellants and explained that he had no desire to arrest anyone. He also attempted to convince them either to seek legal advice and file a civil action to quiet title to the wildlife refuge or to take their complaint to the Congress of the United States, rather than to violate the district court order.

The appellants failed thereafter to vacate the refuge, so on May 2, the district court ordered them to show cause why they should not be held in criminal contempt for their failure to obey the April 30 order. Appellants appeared before the district court on May 2, and were granted a forty-eight hour continuance to prepare their case. Appellants' motion to extend the time for trial preparation were denied, and trial before the court took place on May 4, 1979. Following a two hour trial, appellants were convicted of criminal contempt.

The exact terms of the order are pertinent because some of the issues now raised turn in part on the literal provisions of its concluding paragraph. This reads:

Before hearing evidence, the Court announced that a jury trial would not be necessary inasmuch as the punishment would not exceed the limits allowed by the law for a petty offense. The Court therefore adjudicates the defendants in criminal contempt, 18 U.S.C. §§ 401(3), 402, and fixes their punishment at thirty (30) days in confinement. The United States Marshal will take immediate custody of the defendants.

## II.

Federal district courts are empowered to enforce compliance with their orders and recognition of their authority by both civil and criminal contempt proceedings. *Maness v. Meyers,* 1975, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574; *In re Stewart,* 5 Cir. 1978, 571 F.2d 958; *Norman Bridge Drug Co. v. Banner,* 5 Cir. 1976, 529 F.2d 822. The nature of the contempt charged governs the conduct of the proceedings. *Richmond Black Police Officers Ass'n v. City of Richmond,* 4 Cir. 1977, 548 F.2d 123, 126. Thus, in adjudicating the validity of a contempt order, the first step is to determine whether the nature of the contempt proceeding was civil or criminal. *In re Stewart,* 5 Cir. 1978, 571 F.2d 958, 963; *Lewis v. S.S. Baune,* 5 Cir. 1976, 534 F.2d 1115, 1119.

The district court characterized both its notice to show cause and its judgment as being for criminal, not civil, contempt. Appellants contend that the court's description of the proceedings as criminal was erroneous. Certainly, the label affixed by the court is not decisive; it is our duty to determine whether the contempt is civil or criminal in light of the nature and purpose of the punishment. *Shillitani v. United States,* 1966, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed. 622; *Southern Railway Co. v. Lanham,* 5 Cir. 1968, 403 F.2d 119, 124.

As the Supreme Court pointed out in *Gompers v. Buck's Stove and Range Co.,*

1911, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, civil contempt is remedial; the penalty serves to enforce compliance with a court order or to compensate an injured party. Criminal contempt is punitive; the penalty serves to vindicate the authority of the court and does not terminate upon compliance with a court order. *Accord, In re Stewart,* 5 Cir. 1978, 571 F.2d 958; *United States v. Rizzo,* 5 Cir. 1976, 539 F.2d 458, 463. The sentence below was imposed because of appellants' noncompliance with the court's order.

While a judgment of civil contempt is conditional and may be lifted when the disobedience ends, punishment for criminal contempt is unconditional and fixed. *United States v. Rizzo,* 5 Cir. 1976, 539 F.2d 458, 463. Appellants' punishment was neither contingent nor coercive. Sentence was irrevocably "fixed" at 30 days.

■ A civil contempt proceeding is a facet of the original cause of action, while criminal contempt is a separate cause of action. *Skinner v. White,* 5 Cir. 1974, 505 F.2d 685, 689. Although appellants assume that the contempt proceeding was a mere extension of the underlying ejectment action, this assumption is erroneous. A separate criminal case number was assigned and the merits of the underlying action were not explored. The district court's appointment of the U.S. Attorney to prosecute the contempt case further demonstrates the criminal nature of the proceedings.

Even if the issuance of the "show cause" order and appellants' arrest had the "remedial" effect of safeguarding the government's land during the pendency of the ejectment proceeding, the punitive character of the contempt charge predominates, and fixes the charge as a criminal one for purposes of review. *See In re Stewart,* 5 Cir. 1978, 571 F.2d 958, 963–4.

To argue, as appellants do, that their "passive" refusal to leave the land was punishable only by civil contempt is to play with words. Appellants' manifestation of their intention to remain on the land, in defiance of the court's order, an action in itself in the nature of a continuing trespass, was the only "affirmative act" necessary to serve as the basis for the charge. Accordingly, we conclude that the district court properly considered this a criminal contempt proceeding.

### III.

■ Because the contempt charge was criminal, 18 U.S.C. § 402 was improperly invoked. That section excludes from prosecution contempts committed in disobedience to any order issued in any suit brought or prosecuted in the name of the United States. This language would obviously comprehend actions for ejectment brought by the United States, and appellee concedes as much.

There is a statutory basis for the conviction, however, in the other statute relied on, 18 U.S.C. § 401(3). We may assume, arguendo, that appellants have a valid basis to attack the procedure followed in issuing the TRO that served as the underlying basis for their contempt convictions, and that its substance might be challenged as a prior restraint on First Amendment liberties, although we may not go so far as to assume, even arguendo, that the alleged invalidity of the government's acquisition of title to the land would support a refusal to obey the order.

An order of civil contempt cannot stand if the underlying order on which it is based is invalid, for its only purpose is to secure compliance with the order. Once the order is decreed invalid, compliance is no longer required. *See United States v. United Mine Workers,* 1947, 330 U.S. 258, 294–95, 67 S.Ct. 677, 696, 91 L.Ed. 884, 913; *Cliett v. Hammonds,* 5 Cir. 1962, 305 F.2d 565, 570. The validity of a criminal contempt conviction resulting from violation of a court order, however, does not turn on the validity of that order, *Maness v. Meyers,* 1975, 419 U.S. 449, 459, 95 S.Ct. 584, 591, 42 L.Ed.2d 574, 583; *United States v. United Mine Workers,* 1947, 330 U.S. 258, 294, 67 S.Ct. 677, 696, 91 L.Ed. 884, 913; *Cliett v. Hammonds,* 5 Cir. 1962, 305 F.2d 565, 570, even if that order is later found to have infring-

ed constitutional rights. *Walker v. City of Birmingham,* 1967, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210; *Norman Bridge Drug Co. v. Banner,* 5 Cir. 1976, 529 F.2d 822, 827; *United States v. Dickinson,* 5 Cir. 1972, 465 F.2d 496, *aff'd after remand,* 5 Cir. 1973, 476 F.2d 373, *cert. denied,* 1973, 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223; *see* Cox, *The Void Order and The Duty to Obey,* 16 U.Chi.L.Rev. 86 (1948).

As the Supreme Court noted in *Maness v. Meyers,* 1975, 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d at 583:

> We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.

The jurisdiction of the court is unquestioned; no effort was made to seek judicial review before disobeying its order. *Compare United States v. Ryan,* 1971, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85. *See generally* 3 C. Wright, Federal Practice and Procedure § 702 (1969 & Supp.1978). Thus, the asserted grounds to declare the TRO invalid would not justify the contempt or warrant overturning appellants' convictions.

### IV.

■ Appellants argue that, even if their convictions were proper under 18 U.S.C. § 401(3), the court's failure to specify which part of their convictions was imposed under 18 U.S.C. § 402 requires reversal of the entire conviction. This contention is apparently based on the view that the court's citation of multiple statutory bases for its judgment of contempt made the conviction equivalent to one for multiple counts of contempt.

There is nothing in the record to indicate the court's intention to impose penalties for multiple offenses. There was but a single instance of disobedience of the court's order, and the language of both the notice to show cause and the order indicate that the court intended to punish only once for contempt. Evidently, its reference to multiple statutory bases was made only to buttress the order with dual support. No prejudice resulted from the trial court's erroneous citation of 18 U.S.C. § 402. *See* Fed.R. Crim.P. 7(c). Because there is a valid statutory basis for the convictions properly relied upon by the district court, they are not invalidated by the trial court's erroneous reference to 18 U.S.C. § 402.

■ Whether or not a continuance should be granted lies in the sound discretion of the trial court. *Nilva v. United States,* 1957, 352 U.S. 385, 395, 77 S.Ct. 431, 437, 1 L.Ed.2d 415, 423. Other circuits have held two days, or even one day, to be adequate time for preparation under Rule 42(b) of the Federal Rules of Criminal Procedure in uncomplicated cases of this type. *See In re Sadin,* 2 Cir. 1975, 509 F.2d 1252, 1255–6 (two days); *cf. United States v. Hawkins,* 9 Cir. 1974, 501 F.2d 1029, 1031 (one day; civil contempt). Even now, the appellants do not suggest any defense they might have asserted if given more time and they have never challenged the fact of their defiance of the court's original mandate.

We are not prepared to hold either that discretion was abused by allowing only 48 hours to prepare for trial of the contempt charge or that, even if it was, any prejudice was suffered thereby.

### V.

It may be that there is some valid basis to attack by legal process the government's acquisition of the Timmons tract two generations ago. Counsel who prepared so able a brief are able adequately to mount a proper direct attack. But, until the government's title is divested, the appellants must obey the process issued by the court system that not only protects the government's property but also preserves the appellants' life and liberty while mounting their protest and safeguards their access to a legal forum for

their dispute. The marshal's guns were not drawn against appellants, the militia was not called and those who chose to defy the court order were not injured. Even their confinement has been suspended pending this appeal. The same law that protects their rights will permit the wildlife peacefully to nest in this little part of Guale without disruption by man until man's right to intrude is established lawfully.

For these reasons, the conviction is AFFIRMED.