**In re SASSON JEANS, INC., d/b/a Sasson Industries and Sasson, Debtor.**

**Bankruptcy No. 86 B 12438 (BRL).**

United States Bankruptcy Court, S.D. New York.

Jan. 11, 1988.

Cause Remanded May 13, 1988.

Cole & Deitz, New York City by Edward N. Meyer, of counsel, for Sasson Jeans, Inc. Trustee.

Javits, Robinson, Brog, Leinwand & Reich, P.C., New York City by Robert Leinwand, and Jeffrey Tulchin, of counsel, for Sasson Jeans, Inc.

Gerald J. McMahon, New York City, for Paul Guez and Exactitude, Inc.

Kaye, Scholer, Fierman, Hays & Handler, New York City by Fredrick B. Rosner, of counsel, for Creditors Committee.

Rudolph W. Giuliani, New York City by James Garrity, Asst. U.S. Atty., for U.S.A.

## CERTIFICATION OF CONTEMPT TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK ■

BURTON R. LIFLAND, Chief Judge.

I, Burton R. Lifland, Bankruptcy Judge in the above-captioned case, upon the Application of Bert K. Bergenfield, the duly appointed and qualified Chapter 11 Trustee (the "Trustee") of Sasson Jeans, Inc. ("Sasson" and/or the "Debtor"), and after a hearing held on December 11, 1987, on due notice to Paul Guez and Cheryl Adair, do hereby respectfully submit the following Proposed Findings of Fact and Conclusions of Law to the United States District Court for the Southern District of New York.

The Trustee moved by Order to Show Cause, signed on December 1, 1987, and returnable on December 11, 1987, for an order adjudging Paul Guez and Cheryl Adair to be in criminal contempt of this Court for disobedience of its orders dated November 10, November 11 and November 25, 1987, which orders directed that the Debtor seal and preserve the writings which were located in dumpsters outside 2610 East 37th Street, Vernon, California. The Trustee recommended that Mr. Guez and Ms. Adair be incarcerated for a fixed term for violating the orders of the Court.

The instant order to show cause addresses the second component of a single, continuous course of criminally, contemptuous conduct on the part of Mr. Guez. On November 19, 1987 this Court, from the bench, initially found Mr. Guez to be guilty of criminal contempt as a result of his knowing and willful violation of orders of this Court. (*see* Exhibit 12). Appropriate findings of fact and conclusions of law were then certified to the District Court. Within one week of the November 19 decision Mr. Guez once again knowingly and willfully violated additional orders of this Court, resulting in the instant criminal contempt matter being scheduled for a hearing.

Although the two criminal contempt motions addressed violations of separate orders, each of those orders were entered with an eye toward achieving a single goal, i.e. the expeditious and efficient administration of this Debtor's estate. As demonstrated in the initial certification of contempt Mr. Guez, by violating the subject orders, undermined that goal. Accordingly, this Court views this motion as merely a continuation of the previous one, as both seek the common goal of eliminating continuing impediments to the administration of this Case.

On December 11, 1987, I conducted a hearing on the Trustee's Application. Below are this Court's findings of fact and conclusions of law on the most recent issue of criminal contempt.

### Proposed Findings of Fact

(1) Paul Guez is Sasson's sole shareholder and was, until his removal by the Trustee, the President of Sasson, its Chief Executive Officer, and Chief Financial Officer. Cheryl Adair is a business associate of Mr. Guez.

(2) On October 10, 1986, Sasson filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central District of California. By court order, dated November 12, 1986, the venue of the Case was transferred to the Southern District of New York.

(3) The Official Committee of Unsecured Creditors in the Sasson Chapter 11 case moved, by order to show cause signed February 27, 1987, and again by order to show cause signed May 6, 1987, for an order directing that the United States Trustee appoint a Chapter 11 Trustee to administer the Sasson Chapter 11 case, manage Sasson's business and marshall its assets.

(4) Upon the May 6 order to show cause of the Official Committee of Unsecured Creditors for the appointment of a trustee, and the Debtor's subsequent oral application at a hearing held on May 22, 1987 for the appointment of an examiner in lieu of a trustee, the Court signed an order on June 1, 1987, appointing Robert J. Rosenberg as Examiner of Sasson. (Exhibit 2).[1] That order was signed with the consent of Debtor's then counsel and Mr. Guez. (Exhibit 1 at 220—THE COURT: "this is on consent; is that correct, Mr. Baime? MR. BAIME: Yes. THE COURT: Is that correct Mr. Guez? MR. GUEZ: Yes, Your Honor.").

(5) At the May 22nd hearing Mr. Guez explicitly agreed to cooperate with the examiner. (Exhibit 1 at 220—"THE COURT: With respect to the operations of the business, I expect that the duly retained representative of the creditors, and that includes their accountants, and the examiner, the

---

1. All of the exhibits which are referred to were introduced into evidence at the criminal contempt hearing held on December 11, 1987, and unless otherwise indicated, "Tr." refers to pages of the transcript of the December 11th hearing.

appointed examiner, will get your complete cooperation. MR. GUEZ: Absolutely, Your Honor."). The order appointing the Examiner, prepared by Debtor's then counsel, provided that a Chapter 11 trustee would be appointed if Sasson did not comply with its provisions. (Exhibit 2, first decretal paragraph).

(6) Based on the Debtor's subsequent failure to comply with the June 1, 1987 Order, conceded by Debtor's counsel (*see* the Court's memo endorsement on Debtor's July 14, 1987 order to show cause for a hearing to determine whether Debtor complied with the terms of the June 1, 1987 order) the Court directed the appointment of a Chapter 11 trustee. Mr. Bergenfield has qualified and is presently acting as Chapter 11 trustee for Sasson.

(7) Pursuant to the statutory standards enunciated in 11 U.S.C. § 704 as incorporated by 11 U.S.C. § 1106, as well as the Court's July 30, 1987 order, the Trustee has replaced Paul Guez in managing and operating Sasson, and has been vested with complete control over its operations and management functions since his appointment.

(8) The July 30th order specifically directed that all property of the estate be turned over to Mr. Bergenfield, as trustee. (Exhibit 3). The relevant text of that order states:

> ORDERED that all persons having possession, custody or control of any property of Sasson Jeans, Inc., d/b/a Sasson Industries and Sasson, other than a custodian (as that word is defined in section 101(10) of the Bankruptcy Code), be, and each such person hereby is, specifically directed to turn over all such assets, including, without limitation, all books and records relating to Sasson Jeans, Inc. to Bert K. Bergenfield as Chapter 11 Trustee of Sasson Jeans, Inc. or his written designee;

(9) Despite the July 30th Order, Mr. Guez continued to interfere with Sasson's business and with the Trustee. On August 5, 1987, on the record at a hearing, the Court admonished Mr. Guez:

> Under the circumstances, this record makes it abundantly clear that you do regard this enterprise as your own personal enterprise and apparently as a practical matter, you do not recognize the full role of the Trustee in the operation of the Debtor's business.
>
> The testimony has not been rebutted with any credible force that your activities have interfered in the operations and with the Trustee in the performance of his statutory duties concerning this Debtor and under Title 11.
>
> You have been displaced in the management functions. You do not seem to have recognized that[.] [E]ven with respect to the period of time that an [E]xaminer was involved with the operations of the business, under limited circumstances[.] [D]ealing with the Debtor's assets as if they are your own, under all the circumstances here is clearly inappropriate and indeed illegal.
>
> The right of the Trustee to operate this business without interference is clear. (Exhibit 4 at 162–163).

(10) Also on August 5, 1987, the Court signed an order which, in part, specifically states that it is:

> ORDERED that Paul Guez is specifically directed to turn over all property of Sasson to the Trustee or his written designees.

(Exhibit 5).

(11) At a hearing held on October 7, 1987, the Trustee informed the Court that Mr. Guez had removed a substantial portion of the Debtor's inventory and other property from a warehouse in Vernon, California in violation of the above orders of the Court.

(12) By order to show cause signed November 3, 1987, the Trustee moved to punish Mr. Guez for criminal contempt for orchestrating the removal and concealment of a significant portion of the Debtor's assets. A hearing was held on the Trustee's motion on November 19, 1987.

(13) After the November 19, 1987, hearing, the Court concluded that Mr. Guez had knowledge of the terms of the July 30th order and the August 5th order. Specifi-

cally, the Court found that Mr. Guez was served with the July 30th order and that the August 5th order was signed in Court at the conclusion of a hearing at which Mr. Guez was present. (Exhibit 16 at 6). The Court stated:

I find therefore that substantial assets of the Debtor, (including computer records), all contained in more than twenty trailer loads, were moved from Vernon, California and secreted in a warehouse in Brooklyn, New York. I further find that Paul Guez was intimately involved in, and willfully arranged for: (a) the removal of the assets from California; (b) its shipment to New York; and (c) its concealment from the Trustee—first at his home and, later, at the Brooklyn warehouse in willful and deliberate contravention of the July 30th and August 5th orders.

(*Id.* at 14–15).

(14) The Court concluded that Mr. Guez had committed a criminal contempt and proposed that he be imprisoned for not less than two months stating:

The Trustee has proven beyond a reasonable doubt, by unrebutted evidence, that Mr. Guez' behavior with regard to the transferring and concealing of the Debtor's inventory, merits the imposition of criminal sanctions. The record establishes beyond a reasonable doubt that Mr. Guez was aware of his obligation to turn over the assets of the Debtor. It is beyond a reasonable doubt that he knowingly and willfully violated the July 30, 1987 and August 5, 1987 written orders (orders which Mr. Guez was either served with or were signed in Court, in his presence, subsequent to a hearing at which he was present), (paragraph 11 *supra*), and the August 5, 1987 oral direction of this Court to him, which he explicitly consented to abide. *Id.* Mr. Guez did so by attempting to secrete a substantial portion of the Debtor's assets by moving them from California to the warehouse in Brooklyn. The record establishes beyond a reasonable doubt that the subject property was property of the Debtor's estate. Mr. Guez submitted no convincing evidence which establishes

that these assets belonged to any entity other than the Debtor's estate. [Footnote omitted].

(*Id.* at 18–19).

A. *The Prior Orders and Directions of this Court*

(15) At a hearing held on November 10, 1987, counsel to the Debtor, applied for an order directing that the Trustee abandon certain books and records, located in Vernon, California, and that the Trustee release these records to the Debtor. (Exhibit 7 at 5–11). The Court denied the Debtor's application stating:

THE COURT: Under the circumstances and in view of the lack of disclosure with respect to the contents of that particular warehouse, an ongoing issue which is scheduled to be further brought forward other than today, I am not going to authorize an abandonment, which could possibly have the potential of allowing for, A., tampering of whatever is there, [B,] adding to it or [C,] subtracting from it.

Mr. Meyer's point is well taken that there is no effective way to monitor or police the material that may or may not be there, and we have seen in the past, for example, despite this Court's directions for turning over documents and so forth that notwithstanding this Court's Order, documents get turned over after supposedly all documents had been previously accounted for.

I have no hesitancy in authorizing a sealing of those materials at the Debtor's expense, not to be touched until further Order of the Court.

(*Id.* at 9).

This order was prompted by the Court's familiarity with Mr. Guez' prior conduct and non-compliance in this case. (*See e.g.* Exhibit 6 at 16–17—"THE COURT: That's interesting. Have you turned these papers over to anybody in the past, Mr. Guez? MR. GUEZ: Excuse me, your Honor. The Examiner talks about the same papers and they never—THE COURT: You were supposed to be turning over all these papers relating to the property of Sasson.").

(16) At the November 10th hearing the Court determined that the Debtor (Sasson), not the Debtor's estate, should bear the cost of this storage.

MR. MEYER: Is it the Debtor who is going to bear this expense or—

THE COURT: Absolutely, it's the Debtor who desires the sanctity of the Order of this Court. We will preserve those records at your request and at your expense, Mr. Leinwand.

MR. LEINWAND: Your Honor, I think Mr. Meyer is pointing out that at the Debtor's expense—

THE COURT: Not the Debtor In Possession's expense or the Trustees' expense. The Trustee is clearly by Order of this Court abandoned property which has been the subject of the sale and further disposition.

MR. MEYER: The real party in interest, Your Honor, the positions of the lawyers aside, is Paul Guez. And if it's Paul Guez who wants the stuff sealed up, let him advance the money, if that is what he wants, but shouldn't be borne by this bankruptcy proceeding.

MR. LEINWAND: I understand what Mr. Meyer is indicating. The Debtor has funds—

THE COURT: I will grant you your application. You will submit an Order. The contents, whatever they are, if they are as you point out, the dumpsters, they are to be sealed without access until further Order of the Court and preserved.

MR. LEINWAND: Thank you, Your Honor.

THE COURT: Submit such an Order.

MR. LEINWAND: I will submit such an Order.

THE COURT: Settle it.

MR. LEINWAND: I will either get the consent to settle it. I will get—

THE COURT: *You may take steps to implement it immediately.* [Emphasis added.]

MR. LEINWAND: I will do that. I would appreciate that. Thank you.

(Exhibit 7 at 9–11).

(16) Mr. Guez was present in Court on November 10th when this application was made. (*See Id.* at 26—"THE COURT: I call your attention, Mr. Leinwand, Mr. Guez is sitting here in the courtroom...." *See also, Id.* at 29—"MR. MEYER: While we are waiting, Your Honor, when Mr. Guez walked into this courtroom he brought with him a suitcase full of documents...."). Therefore, I find that Mr. Guez was aware of the Court's concern over monitoring and policing these documents and the direction that the California books and records be sealed and preserved pending further order of the Court.

(17) On November 11, 1987, a consent order was submitted to Bankruptcy Judge Brozman, and signed by her. That order provided:

[I]t is ORDERED, that the Debtor be and it hereby is directed to forthwith seal and *preserve* the writings which are or were located in dumpsters outside the premises known as 2610 East 37th Street, Vernon, California and/or at Total Waste Disposal and/or at West Coast Fiber, Inc., and it is further.... [Emphasis added].

ORDERED that the Debtor and Paul Guez be and they hereby are jointly and severally directed to bear, utilizing no property which is property of or recoverable by the estate, all costs and expenses in connection with the sealing and preservation of the writings ordered herein;

(Exhibit 8).

(18) At the insistence of Mr. Guez, these documents were to be shipped to New York. An agreement was reached between counsel to the Debtor, and counsel to the Trustee, whereby the documents would be loaded into two trucks, which would be locked and sealed, and at the Debtor's counsel's suggestion, driven to the Morgan-Manhattan Warehouse on West 21st Street in New York. (Exhibit 13 at 5–6; Dec. 11 Tr. at 49). The trucks were to be there unloaded, under the supervision of counsel to the Trustee and counsel to the Debtor, and placed in a locked room pending further order of the Court (Exhibit 13 at 5–6 and 12–13).

(19) At a hearing held on November 25, 1987, the Trustee informed the Court that the trucks had "disappeared", and that Mr. Guez had refused to pay the drivers or to allow the records to be stored at the Morgan–Manhattan Warehouse. (Exhibit 13).

(20) On the same day, I signed an order which, *inter alia:*

ORDERED, that the Trustee of Sasson Jeans, Inc. is authorized to employ the services of the U.S. Marshals and the U.S. Marshals are authorized and directed to seize today, from One Whitney Lane, Old Westbury, New York or such other place as they may be found, a certain Yellow Ryder truck, bearing California Licens[e] Plate No. B189022 and a certain Silver and Red U–Haul truck, bearing Massachusetts License Plate No. 304–506, and the contents of said trucks, and to retain custody and control over such trucks, pending the further order of this Court; ...

(Exhibit 14).

(21) By Order to Show Cause signed December 1, 1987, the Trustee moved to punish Mr. Guez and Ms. Adair for criminal contempt for violating the Court's orders regarding the sealing and preservation of the books and records. On December 7, 1987, the Court signed an order modifying the second decretal paragraph of the December 1, 1987 Order to Show Cause to provide that service of a copy of that order by overnight mail upon Mr. Guez and Ms. Adair addressed to them at One Whitney Lane, Old Westbury, New York, shall be good and sufficient service. A hearing was held on the Trustee's motion on December 11, 1987.

B. *The Testimony at the December 11th Hearing.*

(22) The Trustee called Robert Leinwand, counsel to the Debtor. He testified that he was present in Court on November 10th, and that he participated, at the offices of Cole & Deitz, in the drafting of the November 11th Order which reflected the Court's decision. (Dec. 11 Tr. at 43–44). According to Mr. Leinwand he spoke with Mr. Guez from the offices of Cole & Deitz,

before affixing his consent to the November 11th Order, and read the provisions of the order to him. Mr. Leinwand's testimony in this regard is as follows:

Q. My question to you, Mr. Leinwand is, did you in the course of your telephone conversation with Mr. Guez read to him the typewritten portion of Exhibit 8, the Order?

A. Yes, I did.

Q. Did you read parts of it to him more than once?

A. I believe I read—I started reading to him the order, reading him the Order. He indicated that I was reading too quickly and asked me to read slower.

I started again and read more slowly or slower, and there were several decretal paragraphs that I read on more than one occasion to him.

(*Id.* at 47–48).

(23) Mr. Leinwand testified that he believed that Mr. Guez indicated that he did not want the order submitted until Mr. Leinwand conferred with Mr. McMahon. Mr. Leinwand spoke with Mr. McMahon before he signed the consent order, and, on the next day he submitted it to Judge Brozman who signed the order. (*Id.* at 47–48). The day the order was signed, Mr. Guez once again had the order read to him, over the telephone. (*Id.* at 52–55).

(24) Finally, Mr. Leinwand testified that he had a number of conversations with attorneys at Cole & Deitz regarding where the records would be stored if and when they were shipped to New York. (*Id.* at 49). He stated that an agreement was reached whereby the documents would be stored at the Morgan–Manhattan Warehouse on West 21st Street and that this arrangement was embodied in a letter which he sent to Paul Guez. (*Id.* at 49–50; Exhibit 9).

(25) Thus, I find that Mr. Guez was fully appraised of the Orders of the Court, from the Bench on November 10th and as signed on November 11th, as well as the arrangements which were made in furtherance of these orders.

(26) The Trustee then called Dolores Yarmoff, an attorney with Dennis, Juarez, Shafer & Young, a California law firm acting as special counsel to the Trustee in this matter. She testified that the November 11th Order was faxed to her by Cole & Deitz, and by Mr. Leinwand's office on November 11th. (Dec. 11 Tr. at 52). She stated that she met Ms. Adair on November 11th, in her office, at which time she read the order to Ms. Adair and gave her a copy (*Id.* at 52–53). Ms. Yarmoff's testimony in regard to her meeting with Ms. Adair is as follows:

Q. Did you ever discuss the November 11th Order with Miss Adair.

A. Yes, I did.

\*    \*    \*    \*    \*    \*

A. I meet [sic.] with Miss Adair at 3:00 o'clock in my office. I brought her to my office and I had placed the Order halfway—approximately halfway across my desk and we read the Order together, and I read the Order out loud and gave her my copy of the Order.

Q. Did you ever discuss the November 11th Order with Paul Guez?

A. Yes, I did.

Q. Would you tell me how that conversation came about.

A. After I had told Cheryl Adair that an arrangement had been made between Cole & Deitz and Mr. Leinwand to preserve and store the documents located at 2610 Vernon, I told her that I had been instructed to hire an independent trucking company and truck driver. She told me she was unaware of such arrangement and asked if she could call Paul Guez from my office.

Q. Did she make that phone call?

A. Yes, she did.

Q. Did you actually place the call for her?

A. I did.

Q. Do you know whether—did you reach Mr. Guez on the first try that you made?

A. I don't remember.

Q. Did Miss Adair eventually reach Mr. Guez?

A. Yes, she did.

Q. Were you present when that conversation took place?

A. I was.

Q. Could you overhear Mr. Guez' end of the conversation?

A. Yes. I had asked Miss Adair if she wished to speak to Mr. Guez privately and she indicated no.

Q. Would you describe the conversation to the Court, please.

A. Well, she spoke to Mr. Guez and told him—read the Order, not read the Order but told him about the Order and also told him that arrangements had been made by Cole & Deitz and Mr. Leinwand to store and preserve the documents, that an independent trucking company and truck driver would be hired to serve this purpose.

Q. What did Mr. Guez say in response to that?

MR. McMAHON: Objection.

THE COURT: Were you part of the conversation? Did you hear Mr. Guez?

THE WITNESS: I was present.

THE COURT: Overruled.

A. He asked me if I could—if I would tell what the terms were exactly.

I read the Order to Mr. Guez. He appeared to have an Order before him. He recited portions of the Order and asked me if I would send him a letter setting forth the terms of the arrangements between Mr. Meyer and Mr. Leinwand.

Thereafter, I told him I could not do so since I was not privy to the original arrangement....

(*Id.* at 52–55)

As noted previously, Debtor's counsel sent a letter to Mr. Guez Dated November 12, 1987, setting forth the agreement for storing the documents. (*See* Exhibit 9).

(27) Ms. Yarmoff further testified that, after their conversation with Mr. Guez, she and Ms. Adair contacted several trucking companies to arrange for the shipment of the records to New York (Dec. 11 Tr. at 56). Ms. Yarmoff testified that arrangements were made to ship the documents in two trucks, a Ryder truck and a U–Haul

truck, which were to be sealed and pad-locked, and the locks sealed with pink nail polish. (*Id.* at 56–60; Exhibits 10 and 11).

(28) Angela Tese, an attorney with Cole & Deitz, also testified at the hearing. She testified that she spoke with Jeffrey Tulchin, an attorney for the Debtor, on November 23 in order to find out the status of the trucks. (Dec. 11 Tr. at 68–69). Mr. Tulchin informed her that Mr. Guez had refused to pay the truck drivers or to consent to storage of the records at the Morgan–Manhattan Warehouse and that Mr. Guez wanted her to agree to store the trucks in a garage. (*Id.* at 69–70). Ms. Tese told Mr. Tulchin that this was unacceptable, and that she would not consent. (*Id.* at 70).[2]

(29) United States Marshal Anthony Talley was called to testify at the hearing by the Trustee. Marshal Talley testified that on November 25 he executed the November 25 "Order Directing the Seizure and Preservation of Trucks and Records" by going to Old Westbury, New York. (Exhibit 14; Dec. 11 Tr. at 86–87). He stated that he first went to 1 Whitney Lane but was unable to gain access. (*Id.* at 87). He then proceeded to 101 Whitney Lane which is the residence of Mrs. Janine Guez. (*Id.* at 87–88). He testified that he found the Ryder truck at that address, but did not find the U–Haul truck. Marshal Talley testified that the truck was locked and sealed and that he stayed with the truck until a towing company came and took the truck to its warehouse. (*Id.* at 88–89). Ms. Adair has admitted that she drove the Ryder truck to Old Westbury (Exhibit 15—"I drove it [(the Ryder truck)] to Old Westbury myself").

(30) Finally, United States Marshal Francis Norris testified at the December 11th hearing. Marshall Norris testified that he went to Old Westbury, New York on November 25th with Marshal Talley. (Dec. 11 Tr. at 92). He testified that while he was there he had several conversations with Mr. McMahon during which Mr. McMahon offered to arrange to have the keys to the trucks delivered to him. (*Id.* at 92–93). Marshal Norris further stated that Mr. McMahon arranged for a messenger to deliver the keys to him and informed him that the U–Haul truck was located on 34th Street and Tenth Avenue. (*Id.* at 93). The information which Mr. McMahon relayed to Marshal Norris was furnished by Paul Guez. (*See* Affidavit in Opposition to Motion for Contempt Citation at paragraph 13).

(32) Marshal Norris said that he went to 34th Street and 10th Avenue, on Friday, November 27th, but did not find the U–Haul truck. (Dec. 11 Tr. at 93). Marshal Norris then proceeded to the Ryder Yard on 30th Street and 12th Avenue but again did not find the U–Haul truck. (*Id.* at 94). He then proceeded to the U–Haul Yard on 23rd Street and 11th Avenue (*Id.* at 94–95). Marshal Talley spoke to an employee of U–Haul who said that the truck might be by the service entrance. Ultimately, the truck was found parked on 22nd Street just off of 11th Ave. (*Id.* at 95).

(33) Marshal Norris testified that the truck was not sealed and that there were two locks which were clipped, and appeared to have paint or nail polish on them, lying on the rear bumper. (*Id.* at 95 and 110; Exhibits 10 and 11).[3] Marshal Norris further stated that there were papers protruding from the back of the truck marked Sasson and that there was a Sasson tag laying in the street behind the truck. (Dec. 11 Tr. at 97–98).

(34) I find that the testimony of Mr. Leinwand, Ms. Yarmoff, Ms. Tese and Marshals Talley & Norris was entirely credible, and wholly unrebutted. Further, I find that although Mr. Guez and Ms. Adair were afforded adequate notice of the contempt proceeding (discussed below), they did not appear physically or present any evidence at the hearing.

2. Mr. Tulchin was present in the Courtroom at all times. He did not, however, take the stand to dispute Ms. Tese's recollection of the events.

3. Ms. Yarmoff had previously identified the nail polish on those locks as having been furnished by her (Dec. 11 Tr. at 59–60).

(35) Accordingly, I find that Mr. Guez and Ms. Adair had full knowledge of the Court's Orders directing the preservation of the California books and records. I further find that Mr. Guez, with Ms. Adair acting as his full and willing accomplice, willfully and deliberately flouted the Court's orders in taking possession of the trucks, abandoning one on the streets of Manhattan and secreting the other in Old Westbury, and finally in refusing to redeliver the trucks to the Trustee. Due to their actions, the locks and seals were broken on one of the trucks, thereby seriously negating the probative value of the contents of the truck in question. These actions were in clear willful violation of the Orders of the Court.

### Proposed Conclusions of Law

(1) At the outset of the hearing Mr. McMahon, counsel to Mr. Guez, contended that notice of this hearing was defective. Specifically, Mr. McMahon alleged:

(A) Mr. Guez was never personally served with the Order to Show Cause, as initially required by that Order.

(B) Although the Court subsequently amended the Order to Show Cause, authorizing service by overnight mail upon Mr. Guez, the address used by the Trustee was one at which Mr. Guez "upon information and belief" had not been residing for "the last week or so."

(C) The notice failed to meet the standards of:

(1) Fed.R.Crim.P. 42; and

(2) the Due Process Clause of the Fifth Amendment of the United States Constitution.

Each of these allegations are discussed below. None of them, either individually or taken cumulatively, state an adequate basis for finding that the notice provided herein was anything but proper in the context of the underlying facts.

(2) Fed.R.Bankr.P. 9020(b), to the extent applicable, governs contempt when not committed in the presence of the Bankruptcy Judge.[4] Its text tracks, almost verbatim, the language of Fed.R.Crim.P. 42(b). A contempt motion pursuant to Rule 9020(b) is a contested matter, (*See* Advisory Committee Note (1983) to Rule 9014), which is governed by Fed.R.Bankr.P. 9014. That section states in relevant part:

> In a contested matter in a case under the Code not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.... The motion shall be served in the manner provided for service of a summons and complaint by Rule 7004....

Since Rule 7004(b) permits service by mail, any objection based thereon is without merit. *See* Fed.R.Bankr.P. 7004(b).

(3) As noted, Fed.R.Crim.P. 42(b) is the Criminal Rule counterpart to the above cited Bankruptcy Contempt Rule, covering those situations where the criminal contempt is not committed in the actual presence of the Court. The Second Circuit re-

---

4. Fed.R.Bankr.P. 9020(c) states that if timely objections are filed to this order it "shall be reviewed as provided in Rule 9033." Pursuant to the text of Fed.R.Bankr.P. 9033(d): "The district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with the rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions."

In a recent opinion addressing the scope of such a de novo review the Sixth Circuit stated: "[Appellant's] primary point appears to be that the district court failed to conduct a new hearing with live appearances by the witnesses who had testified in the bankruptcy court. He argues that the district court could not make the necessary determinations of credibility from a paper record.

This argument reflects a fundamental misunderstanding of the concept of de novo review.... The district court's de novo review is similar in scope to the court's de novo review of magistrate's report; and in *United States v. Raddatz,* 447 U.S. 667, 674–76 [100 S.Ct. 2406, 2411–12, 65 L.Ed.2d 424] (1980), the Supreme Court found that de novo review under the Federal Magistrates Act does not require the district court to conduct a new hearing on contested issues." *DRD, Ltd. v. Dezign Corp. (In re Dezign Corp.),* 834 F.2d 172 (6th Cir.1987).

cently noted, although in a different context, that Rule 42(b) "prescribes the 'procedural regularity' for *all* contempts in the federal regimes ... except those unusual situations envisioned by Rule 42(a)...." *Dole Fresh Fruit Co. v. United Banana Co., Inc.*, 821 F.2d 106 (2d Cir.1987) (Quoting *In re Sadin*, 509 F.2d 1252, 1255 (2d Cir.1975)). Even directly applying the standards of Rule 42(b), which do not differ substantively in the instant context from Rule 9020(b), there can be no doubt that adequate notice of the instant matter was provided. The relevant text of Rule 42(b) states:

A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest.... Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

According to the language of this Rule, which was incorporated into Fed.R.Bankr. P. 9020(b), notice of criminal contempt charges must be given either: (a) orally, in open court, by the Judge in the presence of the defendant; or (b) on application of the United States attorney or of an attorney appointed by the court for that purpose by an order to show cause or an order of arrest.

■ (4) The procedure followed in the instant proceeding did not fall squarely within these requirements. The order to show cause scheduling this matter was submitted by *Trustee's* counsel, and it provided for the *United States Marshall's* and subsequently *Trustee's* counsel to serve it upon respondents; and for *Trustee's* counsel to prosecute the matter. Nonetheless the substance, if not the form of Rule 42, has been complied with, as due process

requirements were clearly satisfied. *See Bays v. Petan Company of Nevada, Inc.*, 94 F.R.D. 587, 589–90 (D.Nev.1982). The December 1 order to show cause *impliedly* appointed Trustee's counsel to prosecute this criminal contempt proceeding, thereby satisfying the terms of Rule 42(b). *Id.* ("In this case substantial compliance with Rule 42 afforded Respondent due process.... It appears, therefore, that the order to show cause *impliedly* appointed Mr. Neumann [(plaintiff's counsel)] to prosecute this criminal contempt proceeding. [Emphasis added, citation omitted].").

(5) This Court notes that the Second Circuit has ruled that an attorney for a civil litigant, as opposed to a United States Attorney or a disinterested attorney, may properly be assigned to prosecute another party for criminal contempt under Rule 42. *Musidor, B.V. v. Great American Screen*, 658 F.2d 60 (2d Cir.1981), *cert. denied*, 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982). In that opinion the Court stated:

In the leading case of *McCann v. New York Stock Exchange*, 80 F.2d 211, 214 (2d Cir.1935), *cert. denied sub nom. McCann v. Leibell*, 299 U.S. 603, 57 S.Ct. 233, 81 L.Ed. 444 (1936), Judge Learned Hand acknowledged that to prosecute a criminal contempt committed outside the presence of the court, "the judge may prefer to use the attorney of a party, who will indeed ordinarily be his only means of information.... There is no reason why he should not do so, and every reason why he should...." Appellants are well aware that the Advisory Committee on Rules relied upon the *McCann* case in establishing Federal Rule of Criminal Procedure 42.... The practicalities of the situation—when the criminal contempt occurs outside the presence of the court but in civil litigation—require that the court be permitted to appoint counsel for the opposing party to prosecute the contempt. There is no fund out of which to pay other counsel in such an event, nor would it be proper that he be paid by the opposing party. This is not the kind of case for which legal aid societies or public defenders are

available. In short, we follow the above quoted statement by Judge Hand in *McCann.* [Citations omitted].

*Id.* at 65.

Accordingly this Court concludes that *Trustee's* counsel was properly "appointed" pursuant to Rule 42 to prosecute this matter.[5]

■ (6) Fed.R.Crim.P. 49 governs service and filing of papers in criminal contempt matters. Rule 49(b) states:

SERVICE HOW MADE. Whenever under these rules or by order of the court service is required or permitted to be made upon a party represented by an attorney, the service shall be made upon the attorney unless service upon the party personally is ordered by the court. Service upon the attorney or upon a party shall be made in the manner provided in civil actions.

The last sentence of Rule 49(b) incorporates by reference the second and third sentences of Fed.R.Civ.P. 5(b). *See* Notes of Advisory Committee on Federal Rules of Criminal Procedure, Rule 49; *see also United States v. Lujan,* 589 F.2d 436, 438, n. 1 (9th Cir.1978), *cert. denied* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 287 (1979).

The relevant text of Fed.R.Civ.P. 5(b) states:

Service upon the attorney or upon a party shall be made by delivering a copy to the attorney or party or by mailing it to the attorney or party at the attorney's or party's last known address.... Service by mail is complete upon mailing.

Accordingly, nothing in the Federal Rules of Criminal Procedure requires that there be personal delivery of service of an order of this type.[6] Indeed service solely upon Mr. Guez' attorney would have constituted adequate notice of the instant matter. *See Musidor,* 658 F.2d at 65 ("as president and chief operating officer of Great American, [appellant] Dymburt admittedly was bound by the order enjoining Great American, its officers and directors from engaging in specific prohibited conduct, *and his attorney received notice of the motion [of criminal contempt charges] claiming that Dymburt had violated that order* [emphasis added].").

(7) Although personal delivery of service upon Mr. Guez and Ms. Adair was undertaken, each of four attempts proved unsuccessful. (*See* December 7, 1987 Affidavit of Ronald P. Caso). Therefore on December 7, this Court authorized service of the

---

**5.** Although this Court is aware of the Supreme Court's opinion in *Young v. U.S. ex rel. Vuitton et Fils S.A.,* — U.S. —, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), it finds the matter at hand to be distinguishable. *See generally Sassower v. Sheriff of Westchester County,* 824 F.2d 184, 191 (2d Cir.1987).

Specifically, this criminal contempt proceeding was prosecuted by the chapter 11 Trustee who was appointed pursuant to 11 U.S.C. § 1104(c) (a "disinterested" appointee), by a member of the Department of Justice (the *United States Trustee, see* 28 U.S.C. §§ 581 and 503). Accordingly, the chapter 11 Trustee, as a fiduciary vested with a public trust, lacks the characteristics of "interestedness" and the attendant potential for personal gain which tainted the prosecuting party in *Young.*

**6.** In a persuasive opinion addressing the issue of adequate notice in state court criminal contempt proceedings, the Civil Court of the City of New York stated: "An alleged contemnor who may be punished for criminal contempt must be given a notice of the proceeding and an opportunity to be heard. A person may not, however, violate orders with impunity. If 'personal delivery' were required, it would be fairly easy for a person who is disobeying a court order to con-

tinue to flaunt the courts by trying to avoid service. *See Silverstein v. Diaz,* 124 Misc.2d 597, 476 N.Y.S.2d 978 (Civ.Ct.Queens Co.1984); *Frey v. Sipos,* N.Y.L.J. June 20, 1985, p. 12, col. 5 (App.T. 2d Dept). The Court of Appeals has recently noted that those who avoid service may be validly served anyway. *Bossuk v. Steinberg,* 58 N.Y.2d 916, 918–19, 460 N.Y.S.2d 509, 447 N.E.2d 56 (1983). 'It is hornbook law that a constitutionally proper method of effecting substituted service need not guarantee that in all cases the defendant will in fact receive actual notice (*Dobkin v. Chapman,* 21 NY2d 490, 502, [289 N.Y.S.2d 161, 236 N.E.2d 451] ). It suffices that the prescribed method is one "reasonably calculated under all the circumstances, to apprise [the] interested part[y] of the pendency of the action" (*Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314 [70 S.Ct. 652, 657, 94 L.Ed. 865] ).'" *Department of Housing Preservation v. Arick,* 131 Misc.2d 950, 503 N.Y.S.2d 489, 493–94 (N.Y.City Civ.Ct.1986) *cited with approval in Dept. of Housing Preservation and Development of City of NY v. 24 West 132 Equities, Inc.,* 137 Misc.2d 459, 524 N.Y.S.2d 324 (App.T. 1st Dept.1987).

instant order to show cause upon Mr. Guez and Ms. Adair, via overnight mail to their last known address (i.e. One Whitney Lane). (*See* December 7, 1987 Order).

(8) Despite Mr. Guez' counsel's allegations to the contrary, there can be no doubt that the service upon *both* Mr. Guez' counsel and Mr. Guez by overnight mail on December 2nd and 7th respectively, as well as on Debtor's counsel by overnight mail on December 2nd, were reasonably calculated under all the circumstances to provide Mr. Guez with sufficient notice of the hearing and to provide him an opportunity to present objections.

■ (9) As recently as November 29 and 30, 1987 Mr. Guez had telegrams delivered to this Court which telegrams both listed:

Paul Guez
1 Whitney LN
Old Westbury, NY 11568

as his return address.[7] The Order to Show Cause which brought on this hearing was signed on December 1, 1987 only one day after the last Guez telegram listing the Whitney Lane address was received. It is at this address where movants in the instant proceeding served Mr. Guez. In fact, this Court received a telegram from Mr. Guez on December 11, while conducting *this hearing* listing the "1 Whitney LN" address as Mr. Guez' return address. Accordingly, this Court concludes that Mr. Guez was served with notice of this hearing at his "last known address" and that the notice upon Mr. Guez and his counsel was reasonably calculated under all the circumstances, to apprise Mr. Guez of the pendency of this action.[8]

(10) In addition Mr. Guez was afforded adequate opportunity to present his objections. As early as December 3, 1987 both Mr. McMahon, counsel to Mr. Guez, and Mr. Leinwand, counsel to the Debtor, each received copies of the Order to Show Cause scheduling the December 11 criminal contempt hearing. In fact, Mr. McMahon, Guez' counsel, filed papers in opposition to the trustee's motion on December 9, 1987. In addition, as noted above, Mr. Guez and Ms Adair were each served with the Order to Show cause, sent by overnight mail on December 7, 1987, (and therefore they received notice at least three days before the instant hearing).[9] Accordingly, it is beyond

---

7. In addition, Mr. Guez testified before this Court on October 27, 1987 and November 19, 1987 that his current address is One Whitney Lane, Old Westbury, New York.

In a telegram addressed to this Court on November 29, 1987, Ms. Adair also gave her address as One Whitney Lane, Old Westbury, New York.

8. As noted by another court confronted with this issue, "In the particular context of contempts not committed in the immediate presence of the court, it is frequently the case that those who have flagrantly violated the court's orders are not disposed to make themselves readily available for personal delivery of notice that they are to be prosecuted for contempt of those orders." *24 West 132 Equities, Inc.,* N.Y. L.J. December 11, 1987, at 12 col. 1 (App.T. 1st Dept.). This Court is aware of this situation, whereby the alleged victim of defective service is in reality the master of his own fate, and accordingly finds the statement by Guez' counsel, in the Affidavit in Opposition to Motion for Contempt Citation, that "While Mr. Guez has, on occasion, stayed there [ (One Whitney Lane) ], upon information and belief, he has not been residing there for the last week or so." to be insufficient to alter the conclusion that Mr. Guez received adequate notice of the instant hearing.

Indeed the Trustee's duties and responsibilities in the instant case are substantial enough. It would be above and beyond the call of his administrative mandate to compel him, in addition, to keep tabs on Mr. Guez' day-to-day whereabouts. In reversing a conviction for failure to surrender to United States marshalls pursuant to a court order, the Ninth Circuit stated, "It may well be ... that if Grattan [ (the defendant) ] had intentionally, for the purpose of avoiding his duty to appear when ordered to do so, put himself beyond the power of the court to notify him, that would suffice to sustain the conviction." *United States v. Grattan,* 603 F.2d 116, 118 (9th Cir.1979). Similarly, based on the facts of the instant matter, Mr. Guez cannot successfully contend that the notice at issue was defectively served because he allegedly was not present at One Whitney Lane, after representing to this Court and the parties in this Case, on a number of very recent occasions, that that was his address.

9. *See In re Timmons,* 607 F.2d 120, 125 (5th Cir.1979) ("We are not prepared to hold either that discretion was abused by allowing only 48 hours to prepare for trial of the [criminal] contempt charge or that, even if it was any prejudice was suffered thereby."); *United States v. Robinson,* 449 F.2d 925, 931 (9th Cir.1971) (24–hour notice of a criminal contempt hearing was

question that Mr. Guez and Ms. Adair were afforded adequate notice of these proceedings under the applicable standards. As to Mr. Guez this conclusion is buttressed by the fact, noted above, that the instant hearing is in substance a continuation of the initial criminal contempt proceeding.

■ (11) As I have previously stated: There is a distinction between the purpose to be served by a civil contempt order and a criminal contempt order. "[A] civil contempt order is remedial and coercive in nature, and is intended to secure compliance with lawful judicial decrees." *In re Irving*, 600 F.2d 1027, 1037 (2d Cir.) *cert. denied*, 444 U.S. 866 [100 S.Ct. 137, 62 L.Ed.2d 89] (1979). A criminal contempt order on the other hand is intended "to punish willful disregard of the authority of the courts and to deter the occurrence of similar derelictions." *Id.* (citing *U.S. v. United Mine Workers*, 330 U.S. 258, 302–303 [67 S.Ct. 677, 700–701, 91 L.Ed. 884] (1947). "Sentences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court." *U.S. v. Mine Workers*, 330 U.S. at 302 [67 S.Ct. at 700] (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 [31 S.Ct. 492, 498, 55 L.Ed. 797] (1911).

A defendant will be held in criminal contempt for not complying with an appropriate, clear order, where that noncompliance is found, beyond a reasonable doubt, to have been willful. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 782 (9th Cir.1983); *Powell v. Ward*, 643 F.2d 924, 933 n. 12 (2d Cir.1981), *cert. denied* 454 U.S. 832 [102 S.Ct. 131, 70 L.Ed.2d 111] (1981). Willfulness in contempt cases is defined as "a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 782 (9th Cir. 1983).

(Exhibit 16 at pp. 16–17)

(12) On December 11, 1987, after considering all of the evidence, I concluded:

THE COURT: What the Court is reacting to is the record that's been placed before me and all of the evidence that's been put in, the testimony from the stand, all of the evidence which has been not only substantially unrebutted but wholly unrebutted.

It is quite clear that the Trustee has sustained its burden and established a case of criminal contempt against Mr. Guez.

And I am prepared again to certify that this Court's authority has been flouted, that there is disobedience and contumacious conduct by the respondent to warrant a certification of both criminal and civil contempt in this case. The only thing I understand is being asked is criminal contempt.

There were clear directions, full knowledge, and it's been established there was full knowledge on the part of Mr. Guez of his obligation to preserve the integrity of the trucks and the contents of those trucks. That through his willful conduct once again the property that is under the aegis of this Court has been placed in a position of jeopardy, so that the reliability of that property for any purposes, whether it be for purposes of rebutting or advanc[ing] causes in litigation is no longer sacrosanct and subject to without cavil acceptance by the Court.

Under the circumstances I will request submission of finding and conclusions....

MR. MEYER: Has Your Honor made any ruling with respect to Miss Adair?

THE COURT: Yes, I find that she has not responded and I find the testimony fully supports a finding of criminal contempt on her part, and Mr. Guez is a person who accomplished his feats of prestidigitation with respect to the trucks with Miss Adair as a full and

found to be adequate where it was really a renewal of a prior motion, same counsel had represented defendants throughout proceedings,

and there was no real doubt on anyone's part as to the scope of the inquiry.)

willing and in this case willful accomplice, and the record so supported that. (Dec. 11 Tr. at 139–141).

(13) Under the circumstances, the imposition of criminal contempt sanctions is clearly warranted. Mr. Guez, with the aid of Ms. Adair, has again elected to deliberately disregard clear and unambiguous Orders of the Court. The Trustee has proven beyond a reasonable doubt that Mr. Guez and Ms. Adair, although aware of the Court's orders which provided for the sealing and preservation of the documents, knowingly and willfully violated them. They did so by refusing to pay the truck drivers, by interfering with the arrangements which were made for storage of the documents at the Morgan–Manhattan Warehouse, and by taking custody of the trucks and refusing, when ordered, to redeliver them to the Trustee. As a result of their actions, the locks and seals on one of the trucks were broken, the contents disturbed, and the reliability and probative value of the documents were rendered highly dubious.

(14) Accordingly, and in keeping with accepted procedures, I am prepared to certify that Mr. Guez and Ms. Adair be held in criminal contempt. *See Hubbard v. Fleet Mortg. Co.*, 810 F.2d 778, 780 (8th Cir. 1987); *In re Industrial Tool Distributors, Inc.*, 55 B.R. 746 (N.D.Ga.1985); *In re Crabtree*, 47 B.R. 150 (Bankr.E.D.Tenn. 1985). *See also Martin–Trigona v. Shiff*, 702 F.2d 380, 383 (2d Cir.1983) ("the bankruptcy court was not empowered to order a recalcitrant witness to be imprisoned for civil contempt.").[10]

(15) Although this Court has not considered Mr. Guez's prior conduct in reaching its conclusion that he is in criminal contempt, it will consider those activities in recommending a sentence. (*See generally,* Fed.R.Crim.Pro. 32(c); 18 U.S.C. § 3552(b) and 18 U.S.C. § 3553(a)). The evidence adduced at this hearing demonstrates, beyond peradventure that Mr. Guez regards himself as beyond the reach of the Rule of Law.

(16) In addition to his obstinate refusal to turn over the books and records of Sasson to the Trustee, (*See* Exhibits 3; Exhibit 6 at pp. 16–17; Exhibit 7 at p. 29), his refusal to obey this Court's May 22, 1987 and June 1, 1987 orders with respect to the requirement that the examiner be a co-signatory on all Sasson checking accounts, (*See* Exhibit 1 at pp. 214, 221–22; Exhibit 2; and Exhibit 4 at pp. 32–33), and his adversarial attitude concerning the Trustee's efforts to take control of Sasson, (*See* Exhibit 4 at pp. 58–150; Exhibit 5), Mr. Guez has spared no effort to impede and disrupt this proceeding. His violation of the November 10 and November 11, 1987 orders, virtually on the heels of this Court's decision that he had committed an act of criminal contempt by stealing the debtor's inventory, evidences a continuing cavalier disrespect for this Court. For this reason, I recommend that Mr. Guez be imprisoned for a term of four months.

(17) With respect to Cheryl Adair, I have taken into consideration her willful and conceded noncompliance with the orders of this Court, her involvement in the September taking of the assets from the California warehouse (*see* Exhibit 12 at 32 and 39), and her apparent willingness to do Mr. Guez' bidding even if it is patently unlawful. For this reason, the Court recommends that Ms. Adair be imprisoned for 30 days.

(18) I certify these proposed findings of fact and conclusions of law to the District Court.

---

**10.** This procedure is not inconsistent with the operation of Fed.R.Bankr.P. 9020. *See In re Sequoia Auto Brokers Ltd., Inc.*, 827 F.2d 1281, 1291 n. 19 (9th Cir.1987).